# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
SAMSUNG CELLULAR PHONE WITH IMEI NUMBER 356273100775074, )
AND A ZTE CELLULAR PHONE WITH S/N 320367240511, CURRENTLY )
LOCATED AT 555 4TH STREET NORTHWEST IN WASHINGTON, DC )
UNDER RULE 41 )

Case No.  **21-sw-232**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A  incorporated herein and included as part of this Application for a Search Warrant.

located in the _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein and included as part of the attached Affidavit.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

❐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Sections 1591(a)(1); 2422(a); 2421(a); and 18 U.S.C Section 1952(a)(3) | Sex trafficking of children or by force, fraud, or coercion; Coercion and enticement; Transportation generally; Interstate and foreign travel or transportation in aid of racketeering enterprises |

The application is based on these facts:

See Attached Affidavit in Support of Search Warrant.

❐ Continued on the attached sheet.

❐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Thomas Sullivan, Detective, MPD
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date: _____ 07/19/2021 _____

_____
*Judge's signature*

City and state:  Washington, DC _____

G. Michael Harvey, U.S. Magistrate Judge
_____
*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

In the Matter of the Search of                    )
*(Briefly describe the property to be searched*      )
*or identify the person by name and address)*       )     Case No.  **21-sw-232**
SAMSUNG CELLULAR PHONE WITH IMEI NUMBER 356273100775074, AND   )
A ZTE CELLULAR PHONE WITH S/N 320367240511, CURRENTLY LOCATED   )
AT 555 4TH STREET NORTHWEST IN WASHINGTON, DC   )
UNDER RULE 41                    )

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:      Columbia

See Attachment A incorporated herein and included as part of this Application for a Search Warrant.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein and included as part of the attached Affidavit.

**YOU ARE COMMANDED** to execute this warrant on or before _____ August 3, 2021 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ G. Michael Harvey _____ .
                                                                    *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   07/19/2021 _____          _____
                                                                    *Judge's signature*

City and state:      Washington, DC _____          G. Michael Harvey, U.S. Magistrate Judge
                                                                    *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>   **21-sw-232** | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

   I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF SAMSUNG CELLULAR PHONE WITH IMEI NUMBER 356273100775074, AND A ZTE CELLULAR PHONE WITH S/N 320367240511, CURRENTLY LOCATED AT 555 4TH STREET NORTHWEST IN WASHINGTON, DC UNDER RULE 41** | **SW No.** 21-sw-232 |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41**
**FOR A WARRANT TO SEARCH AND SEIZE**

I, Thomas Sullivan, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property, two digital devices which are currently in law enforcement possession (the "Devices"), as described in Attachment A, and the extraction from that property of electronically stored information as described in Attachment B.

2.      I am a Detective with Metropolitan Police of the District of Columbia since 2009. I have worked in the capacity of patrol officer, automobile theft investigator, child abuse investigator, and currently as an investigator at the Federal Bureau of Investigation (FBI) Child Exploitation and Human Trafficking Task Force. Your affiant has been deputized by the United States Marshal Service as a Task Force Officer. Your affiant's duties and responsibilities are to investigate the sexual exploitation of children, child pornography offenses, and the sex trafficking of minors and adults.   Your affiant has gained experience in conducting such

## **ATTACHMENT A**

*Property to be searched*

The property to be searched is a Samsung Cellular Phone, with IMEI Number 356273100775074, and a ZTE Cellular Phone, with Serial Number 320367240511. The Device is currently located at 555 4th Street Northwest in Washington, DC.

## ATTACHMENT B

### *Property to be seized*

1.    The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of Title 18 US Code Sections 1591(a)(1), 2422(a), 2421(a), and Title 18 US Code 1952(a)(3)(the "Target Offenses"), as described in the search warrant affidavit, including, but not limited to:

   a.   Records and information that constitute evidence of the Target Offenses including, but not limited to, the facilitation, promotion, recruitment, management, furtherance, and/or intent to engage in the commercial sexual exploitation of victims.

   b.   Records and information relating to the identity or location of perpetrators, aiders and abettors, coconspirators, and accessories after the fact;

   c.   Records and information that constitute evidence of the state of mind Michael Wilkins, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation; and

   d.   Records and information that constitute evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with Michael Wilkins or other unknown co-conspirators about matters relating to

the criminal activity under investigation, including records that help reveal their whereabouts.

e.  evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

f.  evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

g.  evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

h.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

i.  evidence of the times the Device(s) was used;

j.  passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

k.  documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

l.  records of or information about Internet Protocol addresses used by the Device(s); and

2

m. records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

investigations through training in seminars, classes, and everyday work related to these types of investigations.

3.     Based on my training, experience, and participation in this investigation I know that in the context of human trafficking investigations the following are true:

    a.  The women that work for men engaged in commercial sexual exploitation are derogatorily referred to as "prostitutes," "street walkers," "hoes," or "call girls." Some of these women are not residents of the District of Columbia or the metropolitan area. The women are often transported to the area from other states.

    b.  Men who engage in the commercial sexual exploitation of women like to refer to themselves as "Pimps."   They make their money exploiting vulnerable women.  The victims often have poor self-esteem, low levels of education, and who come from dysfunctional families.

    c.  Men who engage in the commercial sexual exploitation recruit young women using deceit, psychological manipulation and physical violence to force the females to participate in sexual favors for money, referred to as "tricks." The sexual acts include vaginal intercourse commonly referred to as a "lay", oral sex commonly referred to as "head" or a "blow job," anal sex referred to as "Greek," and manual masturbation, commonly referred to as a "hand job."

    d.  The Track is an area of a particular city the streets where the women who are engaging in commercial sex acts walk and solicit dates. In major cities it is commonly referred to as the "red light district." Those engaging in the

commercial sexual exploitation of others walk and drive along the Track to recruit new victims.

e. Individuals who engage in the commercial sexual exploitation of others are now using social media in an effort to recruit women to "work" for them. These social media sites include Instagram, Facebook, Snapchat, and other popular social media websites. It is comment for these individuals, referring to themselves as "Pimps" use these websites to promote their lifestyles, wealth, and present an image to the outside world that is much different than the realities of the victims' lives.

4. As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

6. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. Sections 1591(a)(1);  2422(a); 2421(a); and 18 U.S.C Section 1952(a)(3) have been committed by Michael Jabaar Wilkins ("WILKINS").  There is probable cause to believe that the individual who owned the ZTE phone, known to law enforcement as Victim 1, was a women who was victimized by WILKINS.  Therefore, there is probable cause to search the Devices described in

Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachment B.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

7.       A Samsung Cellular Phone, with International Mobile Equipment Identity Number 356273100775074 and a ZTE Cellular Phone with S/N 320367240511 (the "Devices"). As detailed below, the ZTE Cellular Phone was recovered from Victim 1, after she was arrested as a result of an undercover operation conducted MPD on or about September 11, 2019.  The Samsung Cellular Phone was recovered from the dashboard of an Enterprise Rental Vehicle that WILKINS was driving when he was arrested during the early morning hours of November 5, 2019.

8.       The Devices have been secured at the United States Attorney's Office, located at 555 4th Street Northwest in Washington, DC.

## PROBABLE CAUSE

9.       Members of the MPD and FBI CEHTTF have been actively investigating an area of Washington, DC known for street-level commercial sexual exploitation.  This area stretches from the South at K Street, Northwest to the North at Rhode Island Avenue, Northwest, and from the East at 9th Street, Northwest, to the West at 14th Street Northwest (herein the "target area"). The target area is the subject of a substantial number of complaints to police between the hours of 3:30 a.m. to 8:00 a.m. by individuals residing or working in the target area.  These complaints are primarily related to crimes stemming from the ongoing commercial sexual exploitation activity occurring in the target area, to include complaints of robberies, prostitution, disorderly conduct, and violent assaults.

4

10.     On August 7, 2019, at approximately 7:00 a.m., a resident of the 1300 block of 12th Street, Northwest observed an assault behind her home.  The assault was also captured by surveillance footage.  The reporting witness advised that she saw a male, whom the witness called a Pimp, attack a female whom the witness referred to as a prostitute.  The reporting witness forwarded this information and the surveillance footage to a member of MPD's Third District, who in turn provided the information to your affiant.

11.     Your affiant reviewed the surveillance footage and observed a man, known to your affiant as WILKINS, physically assault a female known to engage in commercial sex acts, Victim 1.  The video depicts WILKINS cornering Victim 1 in the parking pad of a home in the 1300 block of 12th Street Northwest.  WILKINS is shown grabbing Victim 1's arm as she attempts to move away from him, and striking her with an open hand.  The video also shows WILKINS grabbing either side of Victim 1's head and neck and shaking Victim 1's head.

12.     This surveillance video shows that the assault is witnessed by another man known to your affiant as Amiyr Keon Brown (herein "BROWN"), who is standing in close proximity to WILKINS as WILKINS assaults Victim 1.  BROWN is also known by your affiant to frequent the target area and is believed to be a pimp involved in the commercial sexual exploitation of females.  BROWN can be heard yelling at Victim 1 and stating that she had looked at him while she was walking around.  Victim 1 is heard denying that she looked at BROWN, stating that she was talking to an "old trick" and that BROWN was wrong about her looking at him.

13.     A third man known to your affiant as Gabriel Reachmack (herein "REACHMACK") is depicted in the surveillance video walking up during this argument between BROWN and Victim 1 and telling WILKINS that Victim 1 embarrassed herself.

REACHMACK states that WILKINS's "ho is in the toilet."  REACHMACK then mimics flushing something down a toilet with his foot.  REACHMACK additionally states that Victim 1 had been looking at another pimp that was not hers.

14.     The surveillance video then depicts BROWN, REACHMACK, and WILKINS leaving the area in two different vehicles.  They leave Victim 1 behind.  Victim 1 was contacted by MPD Patrol Officers shortly after the men left.

15.     Previously, on July 26, 2019, members of the MPDC/FBI CEHTTF conducted surveillance in the target area from the hours of 3:30 a.m. until 7:30 a.m.  During the course of the surveillance, the members of CEHTTF observed WILKINS and BROWN standing in the 1300 block of 12th Street, Northwest with other men believed to be engaged in the facilitation of commercial sexual exploitation.  Additionally, the members of CEHTTF observed Victim 1 walking the target area during the same hours, engaging in behavior that indicates to your affiant that Victim 1 was engaging in commercial sex transactions.  Victim 1 was observed standing in the target area and talking with other women believed to be engaging in commercial sex transactions.

16.     The members of CEHTTF also observed some of the men seen with WILKINS leave the area with some of the women believed to be engaging in commercial sex transactions in the target area.  WILKINS was observed picking up Victim 1 while he was driving a Cadillac Sedan, with Virginia registration UWH-4045.  Law enforcement has learned that this vehicle is registered to WILKINS.  WILKINS and Victim 1 were observed traveling out of the target area on Rhode Island Avenue, Northwest, and surveilled until they turned north on Lincoln Road, Northeast.

17.     Your affiant conducted a records search of open source and law enforcement databases in an effort to determine Victim 1's identity.  A photograph of Victim 1 from a July 26, 2019 surveillance operation was uploaded to facial recognition software which led to a match.  You affiant learned that Victim 1 was a witness to an incident in Norfolk, Virginia, on June 12, 2019, in which WILKINS suffered a gunshot wound to his groin.

18.     A phone number of (757) 752-3382, which is registered to T-Mobile, was identified as belonging to Victim 1 from an open source database search.  Members of the CEHTTF searched for this phone number in a database that compiles prostitution-related advertisements and found that it was linked to six hundred and ninety-one (691) commercial sex advertisements with dates ranging from February 1, 2019 to August 10, 2019.  These advertisements were posted in twenty-three cities including Virginia Beach, Chesapeake, and Norfolk, Virginia, and Washington, D.C.  Among these advertisements was an advertisement for Victim 1 that was posted on June 12, 2019 in Norfolk, Virginia.

19.     Your affiant conducted a records search of law enforcement databases and open source databases in an attempt to identify a history of contacts that WILKINS has had with law enforcement.  Your affiant found that a witness spoke to law enforcement on September 9, 2017, and advised law enforcement that he had known WILKINS since he was a child.  The witness advised that WILKINS has a history of being involved in narcotics distribution, and also advised that WILKINS was a "Pimp."  The witness reported that WILKINS had transported at least three women to Washington, D.C. to engage in prostitution from the Norfolk, Virginia area, and that he had been arrested in Virginia with one of these females.  The witness advised that this

information was gathered from statements made to the witness by WILKINS, and by first-hand observations the witness had made of WILKINS.

20.     On August 3, 2019, members of MPD's Human Trafficking Unit ("HTU") were acting in an undercover capacity in the target area.  One of the HTU members was working undercover posing as a commercial sex worker.  This HTU member was contacted by WILKINS while in the undercover capacity.  The undercover officer reported that WILKINS, who was in the driver's seat of a green conversion van, contacted her while she was in the target area. WILKINS asked the undercover officer who she worked for and why she was out on his block. The undercover advised WILKINS that it did not matter who she worked for, and asked why he was asking her.  WILKINS advised the undercover that she was speaking with a Pimp, and the undercover asked WILKINS if he was looking for a date.  The undercover advised that WILKINS became agitated at this point, and got in the undercover officer's face.  WILKINS walked away from the undercover officer, and proceeded to watch the undercover as she continued to stay on the block.  The undercover officer reported that she continued to act as if she was soliciting dates, and she engaged in conversations with potential commercial sex customers while WILKINS watched.  The undercover officer reported that she asked a customer to come back in ten minutes for a date and, once the customer left, WILKINS again approached the officer and asked why she was giving money away.  The undercover advised that she did not turn any tricks for $15, and told WILKINS that, while he allowed his girls to do that, she would not.  WILKINS advised the undercover at this time that he would not let his girls do so either.

21.     WILKINS then asked how much money the undercover had on her, and reached for the undercover's fanny pack.  The undercover swatted WILKINS's hand away and told him

not to touch her.  WILKINS responded by squaring up in a fighting stance with the undercover, and chest bumped her.  WILKINS then told the undercover to go sit in the green van so that they could talk.  The undercover advised WILKINS that she had not "chosen up" and that she was not going anywhere with him.  WILKINS continued to linger in the area after the exchange with the undercover, which forced the undercover to leave the area.

22.     On September 10, 2019 (that is, after WILKINS's assault of Victim 1 on August 7), members of HTU were acting in an undercover capacity in the 2300 block of New York Avenue, Northeast due to complaints regarding prostitution activity in the area. During the course of the operation, an undercover officer contacted Victim 1 through an advertisement posted on a known commercial sex website, which indicated that Victim 1 was available for commercial sexual activity. The undercover officer arranged to meet with Victim 1 to engage in sex acts with her in exchange for money.  The undercover asked that Victim 1 come to the Fairfield Inn and Suites located at 2305 New York Avenue Northeast to engage in a commercial sex transaction.

23.     On September 10, 2019, at approximately 10:58 pm, members of the HTU observed Victim 1 being dropped off at the Fairfield Inn and Suites by an individual driving a Dodge Ram 1500 Conversion Van with Virginia Tags UTF-1990.  The HTU member who was acting as an undercover officer on August 3, 2019, as described above, observed the green conversion van drop Victim 1 off, and recognized the vehicle as the same vehicle from which WILKINS approached her.

24.     Members of the HTU arrested Victim 1 shortly thereafter for the offense of "Solicitation of Prostitution," and transported her to the Fifth District for processing.  Victim 1

9

was found to be in possession of the ZTE Cellular Phone which was seized as evidence.  Victim 1 was interviewed shortly after being arrested.  She initially reported that she had been dropped off at the hotel by a "date."  Victim 1 then reported that the man who dropped her off was her pimp, and that she had only known him for approximately a month.  Victim 1 advised that she did not know her pimp's real name, but reported that his nickname is "Lucky."  Victim 1 further reported that she and "Lucky" had been staying at hotel rooms together.

25.     Members of HTU located the green conversion van described above shortly after Victim 1 was arrested and conducted a traffic stop of the vehicle, which was observed idling at a gas station for an extended period of time.  WILKINS was the driver of the vehicle, and there were no other occupants in the vehicle.  WILKINS agreed to a search of his vehicle.   Several purses, a bulk package of Trojan condoms, and items of female clothing were located in the van. WILKINS was released from the scene at that time, and was not advised that he had been observed dropping Victim 1 off at the hotel – prior to the date she had arranged with the undercover law enforcement officer.

26.     On September 19, 2019, Magistrate Judge Meriweather of the United States District Court for the District of Columbia authorized search warrants for two different cellular telephones:  one which was recovered from WILKINS pursuant to an arrest in 2018, and the other which was recovered from Victim 1 at the time of her arrest.  A computer forensic examiner conducted an examination of the contents of these devices, and provided a report detailing the contents of both devices to your affiant.  Your affiant has reviewed these reports. Specifically, contained in the forensic extraction from Victim 1's phone, your affiant observed numerous multimedia messages between Victim 1's phone and the phone number (757) 275-

5031. Victim 1 identified the person who used this phone number as "Mike" or "Daddy" in her contact list.   Additionally, the user of the phone number (757) 275-5031 sent a "selfie"-style photograph on August 31, 2019 to Victim 1.  The photograph depicted WILKINS and included a message stating "come home bitch."  The communications between Victim 1 and the person using the phone number (757) 275-5031, believed to be WILKINS for the reasons stated above, revealed that Victim 1 left Washington, D.C. shortly after the assault captured on the surveillance video, described above, and returned to the Norfolk, Virginia area.  WILKINS and Victim 1 repeatedly refer to the Norfolk areas as "home" throughout their text message exchange.

27.     Between mid-August 2019 and September 5, 2019, using telephone number (757)275-5031, WILKINS repeatedly attempted to persuade, induce, and coerce Victim 1 to travel from Norfolk, VA to Washington D.C., in order for her to engage in prostitution for his benefit.  For example, on August 16, 2019, WILKINS sent a text message to Victim 1 which stated, "Get up baby come on down here I've been telling the my b**** coming back its prime time Friday daddy broke ass shit im hurting I need my hoe to do her hoely dutys hurry up n come see about me."  On August 30, 2019, WILKINS sent Victim 1 a series of text messages which read: "I still hav love for u stop crying I want to make things right come on back up here with me we need eachother baby"; "Daddy gon take care of u"; and "Don't be no fool bitch stay focused that bitch washy washy get ur ass on the bus n let's carry on our mission bitch…".  On September 3, 2019, WILKINS sent Victim 1 a series of texts that stated, "So why don't us come up here so we can get sum money"; "Its no need for me to wait for u cuz i know you aint coming back cuz if u was u would have been came im just ready to come back n get on my mission to get

me some money my car right n find me a new bitch a strong one"; and "So get up here then lets

get all the money we can get so I can grind while im home."  Subsequent text exchanges on

September 3 – 4, 2019 discuss Victim 1 traveling by bus from Norfolk, VA to Washington, D.C.

Through these messages, Victim 1 provided WILKINS with the address of Union Station,

located in Washington D.C., and informed him that she would arrive at 1:30 a.m. on the morning

of September 5, 2019.  WILKINS responded to Victim 1's text messages, and informed Victim 1

that he was at the station waiting for her. Subsequent messages revealed that WILKINS picked

Victim 1 up from Union Station and took her to the target area where Victim 1 began to engage

in commercial sex acts with various customers.

28.     On October 11, 2019, members of CEHTTF presented an affidavit to a United

States District Court (USDC) of the District of Columbia Magistrate Judge in support of a search

warrant ordering T-Mobile to provide historical and prospective cell site data for the telephone

numbers of (757) 257-5031 (believed to belong to WILKINS) and (757) 275-5588 (belonging to

Victim 1).  The affidavit was reviewed and the search for historical and prospective cell site data

was approved by USDC Magistrate Judge Robinson (2019-SC-2061).

29.     Members of CEHTTF began to receive geolocation data from T-Mobile in the

form of latitude and longitude coordinates after the search warrant was authorized.  The

members found that the two phone numbers identified as belonging to WILKINS and Victim 1

were consistently in close proximity to one and the other.  Additionally these devices were found

to be at coordinates belonging to hotels in Washington, Norfolk, and Prince Georges County,

Maryland.  Your affiant was able to locate prostitution advertisements for Victim 1 during the

time period the telephones were geo-locating to these areas.

30.     On October 29, 2019, your affiant identified locations using the geolocation data provided by T-Mobile within Washington, DC that WILKINS and Victim 1 were located at. Your affiant conducted surveillance in the area of New York Avenue and Bladensburg Road Northeast and located WILKINS and Victim 1 at a gas station located to the northwest of the identified intersection.  Your affiant observed WILKINS and Victim 1 standing next to a white Hyundai Elantra with Virginia registration of "UMK-8235." WILKINS and Victim 1 entered the vehicle and then departed the area.  Your affiant continued to conduct surveillance on the vehicle and found that the geolocation data from phone numbers (757) 257-5031 (believed to belong to WILKINS) and (757) 275-5588 (belonging to Victim 1) was consistent with the movement of the vehicle.

31.     On October 31, 2019, an affidavit in support of an arrest warrant for WILKINS was presented to USDC Magistrate Judge Robinson.  The affidavit was reviewed and USDC Magistrate Judge Robinson ordered the arrest of Wilkins for violations of 18 U.S.C. 2422(a) and 18 U.S.C. 1952(a)(3).

32.     Members of the CEHTTF found that Wilkins and Victim 1 had traveled from Washington, D.C. to Norfolk, Virginia shortly after being observed in Washington, D.C. by your affiant.

33.     During the early morning hours of Sunday, November 3, 2019, members of CEHTTF found that the phone numbers (757) 257-5031 (believed to belong to WILKINS) and (757) 275-5588 (belonging to Victim 1) were currently geo-locating to areas in Washington, DC. The members found that the devices had been active in the K Street area from approximately

03:00 a.m. to 07:00 a.m., and then active at a motel near Andrew Air Force Base in Prince Georges County, Maryland.

34.     On November 4, 2019, members of the CEHTTF conducted surveillance in the K Street area from approximately 6:00 a.m. to 7:30 a.m.  The members found that phone numbers (757) 257-5031 (believed to belong to WILKINS) and (757) 275-5588 (belonging to Victim 1) were geo-locating to the K Street area at that time.  The members subsequently observed Victim 1 standing near the intersection of 12th Street and M Street Northwest and later observed WILKINS operating the Hyundai Elantra with Virginia registration of "UMK-8235" near the south edge of Logan Circle.  These locations are both within the area CEHTTF has identified as an area of human trafficking and commercial sexual exploitation.

35.     On November 5, 2019, members of the CEHTTF found that WILKINS and Victim 1's device were geo-locating to the K Street area.  The members responded to the area with the intent to locate and arrest WILKINS.

36.     At approximately 5:00 a.m., the members observed WILKINS operating the same Hyundai Elantra near the intersection of 14th and Rhode Island Avenue Northwest.  WILKINS was followed by members of CEHTTF and stopped shortly after by members of the FBI Washington Field Office (WFO) Tactical Team.

37.     WILKINS was stopped in the identified Hyundai Elantra at the 1100 block of 14th Street Northwest, and taken into custody by the FBI WFO Tactical Team.  The vehicle was seized as evidence at that time, and members of CEHTTF conducted a cursory search of the vehicle.  During this search, CEHTTF noticed a Samsung Cellular Telephone mounted to the dashboard.  This phone was seized by law enforcement and powered off.  Your affiant has

observed that after the Device was powered off, no further geolocation data from phone number (757) 257-5031 (believed to belong to WILKINS) was received.

38.     Members of the CEHTTF attempted to interview WILKINS at the FBI WFO. WILKINS was advised of his Miranda Rights post arrest during this interview, and asserted his right to counsel.  WILKINS was turned over to the United States Marshals Service (USMS) shortly after, and was presented for an initial hearing in front of USDC Magistrate Judge Harvey.

39.     Victim 1 was interviewed by law enforcement on November 5, 2019, and she discussed engaging in commercial sex work for WILKINS financial gain.  She also described that WILKINS has assaulted her in the past.  As the investigation has progressed, law enforcement have discovered three other women who were recruited by WILKINS and who engaged in commercial sex acts in the target area for WILKINS financial benefit.  One of these women was repeatedly assaulted during the time that she "worked" for WILKINS, sustaining a severe eye injury that has lasting effects and which has caused her vision loss to this day.

40.     WILKINS was originally indicted in November of 2020.  In December 2020, a Superseding Indictment was returned, charging WILKINS with two counts of Sex Trafficking by Force, Fraud and Coercion, in violation of 18 U.S.C. Section 1591(a)(1); two counts of Coercion and Enticement, in violation of 18 U.S.C. Section 2422(a); three counts of Transportation for the Purpose of Prostitution, in violation of 18 U.S.C. Section 2421(a); and ITAR, in violation of 18 U.S.C. 1952(a)(3).  WILKINS has elected to proceed to trial, which is scheduled for July 26, 2021.

41.     Based upon the above, there is probable cause to believe that the Devices seized

from WILKINS and Victim 1 include evidence to including phone logs, contact information, text messages, emails, and pictures which are related to WILKINS communications with Victim 1 and the other victims in this case, including his repeated efforts to entice, induce, persuade and coerce Victims 1, 2 and 3 to travel in interstate commerce to engage in prostitution.  Indeed, the original forensic extraction of the devices, performed in September and November of 2019, as detailed above, describe contact between WILKINS and Victim 1 regarding his efforts to get her to travel from Virginia to Washington, D.C. so that she could engage in sex acts for his financial benefit.  The communications also detail his ongoing manipulation and coercion in order to get her to continue commercial sex work for his financial gain.

42.     Your affiant seeks this warrant, in an abundance of caution, in order to use the tool known as Cellebrite to connect to the Devices and perform new extractions on the Devices. The Devices have remained in law enforcement custody since they were seized, and have remained powered off in airplane mode since their initial extractions.  I know from my training and experience, and from my conversations with others, that since the fall of 2019, Cellebrite has gone through several upgrades.  Based upon my training and experience, I have learned that with each upgrade to, and new version of, Cellebrite, it is possible to recover additional forensic artifacts and data that were previously not parsed by Cellebrite and were therefore unreadable. Given the fact that the last extraction was performed nearly two years ago, and that this program has been upgraded several times during that time, your affiant seeks permission to use the latest version of Cellebrite in order to obtain new extractions from the phones belonging to WILKINS and Victim 1.

## TECHNICAL TERMS

54.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

        a.      "Digital device," as used herein, includes the following three terms and their respective definitions:

                1)      A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.  *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

                2)      "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

                3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices

(including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

      b.     "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

      c.     A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen.  Like wireless phones,

tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

        d.     A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

        e.     "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test"

keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

    f.  "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

    g.  Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    h.  The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

    i.  "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their

customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of

an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

   m. "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

   n. "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet.  In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software.  A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network.  A P2P file transfer is assisted by reference to the IP addresses of computers on the network:  an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.    One aspect of P2P file sharing is that multiple files may be downloaded at the same time.  Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

i.      When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software.  The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

ii.      Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

o.      "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.  This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

p.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an

encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.     "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems.  It can appear in the form of code, scripts, active content, and other software.  Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

55.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at https://www.zteusa.com/products/all-phones, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offense(s) under investigation.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

56.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the Device, in whatever form they are found.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this

investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the Devicefor at least the following reasons:

a.      Individuals who engage in criminal activity, including involving human trafficking, use digital devices, like the Device(s), to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like the Device, documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and records of illegal transactions using stolen financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators; and (4) store stolen data for future exploitation.]

b.      Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.      Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or

viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

57.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information

related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

      a.      Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.   In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant.   Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.   Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).   Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.   Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.   Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.   Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.   This

data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.      I know that when an individual uses a digital device to facilitate, further, and/or promote human trafficking, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The digital device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

58.    Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital

devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.     Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular

data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

        d.     Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through

data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

    e.  Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

    f.  Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.

Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

59.    In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

a.    The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

b.    The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword"

searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c.   In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.   Any search techniques or protocols used in searching the contents of the Device(s) will be specifically chosen to identify the specific items to be seized under this warrant.

## AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

60.   Because forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## **CONCLUSION**

61.     I submit that this affidavit supports probable cause for a warrant to search the

Device described in Attachment A and to seize the items described in Attachment B.


Respectfully submitted,

_____

Thomas Sullivan
Task Force Officer
MPDC


Subscribed and sworn by telephone pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) before
me on July 19, 2021


_____

G. MICHAEL HARVEY,
 UNITED STATES MAGISTRATE JUDGE

35